IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CARINA M. H.,[1]                                        Case No. 6:22-cv-00589-JR

       Plaintiff,                                OPINION AND ORDER

       v.

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

         Defendant.

RUSSO, Magistrate Judge:

      Plaintiff Carina H. brings this action for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income and Disability Insurance Benefits under the Social Security Act. All parties have consented to allow a Magistrate Judge enter final orders and judgement in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). For the reasons set forth below, the Commissioner's decision is reversed, and this case is remanded for further proceedings.

---

[1] In the interest of privacy, this opinion uses only the first name and initial of the last name of the non-governmental party or parties in this case. Where applicable, this opinion uses the same designation for a non-governmental party's immediate family member.

## BACKGROUND[2]

Born in April 1981, plaintiff alleges disability as of July 28, 2018,[3] due to degenerative disc disease and corresponding back pain and radiculopathy. Tr. 41, 331-32, 337-38, 359. Her applications were denied initially and upon reconsideration. On May 24, 2021, a hearing was held before an Administrative Law Judge ("ALJ"), wherein plaintiff was represented by a non-attorney representative and testified, as did a vocational expert ("VE"). Tr. 36-65. On June 30, 2021, the ALJ issued a decision finding plaintiff not disabled. Tr. 15-30. After the Appeals Council denied her request for review, plaintiff filed a complaint in this Court. Tr. 1-6.

## THE ALJ'S FINDINGS

At step one of the five step sequential evaluation process, the ALJ found plaintiff had not engaged in substantial gainful activity since the alleged onset date. Tr. 18. At step two, the ALJ determined the following impairments were medically determinable and severe: "degenerative disc disease, fibromyalgia, and migraine." *Id.* At step three, the ALJ found plaintiff's impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment. Tr. 20.

Because she did not establish presumptive disability at step three, the ALJ continued to evaluate how plaintiff's impairments affected her ability to work. The ALJ resolved that plaintiff

---

[2] The record before the Court constitutes nearly 1100 pages, but with multiple incidences of duplication. Where evidence occurs in the record more than once, the Court will generally cite to the transcript pages on which that information first appears in its entirety.

[3] Plaintiff previously applied for, and was denied, disability benefits, such that her "alleged onset date corresponds to one day after the previous hearing." Tr. 21, 133; *but see* Tr. 349 (plaintiff's counsel seeking to amend her alleged onset date to August 2, 2018). The ALJ resolved that "[t]he presumption of continuing nondisability has been rebutted in this adjudication by changed circumstances relating to the allegation of migraine that was not previously considered as well as worsening of her back and chronic pain impairments." Tr. 15-16. Indeed, plaintiff alleges an increase in symptoms corresponding with a November 2018 motor vehicle accident. *See, e.g.*, Tr. 42, 49.

had the residual function capacity ("RFC") to perform light exertion work as defined by 20 C.F.R. § 404.1567(b) and § 416.967(b) except she: "can frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds"; "can occasionally stoop, kneel, crouch, and crawl"; and "requires the ability to alternate between sitting and standing at will while remaining on task." Tr. 20-21.

At step four, the ALJ determined plaintiff was unable to perform any past relevant work. Tr. 28. At step five, the ALJ concluded there were a significant number of jobs in the national economy that plaintiff could perform despite her impairments, such as office helper, hand packager inspector, and small products assembler. Tr. 29-30.

## DISCUSSION

Plaintiff argues the ALJ erred by: (1) discrediting her subjective symptom statements; and (2) improperly assessing the medical opinions of Starr Matsushita, D.O., Ashkan Abedini, M.D., and Bharat Gopal, M.D.[4]

## I.    Plaintiff's Testimony

Plaintiff contends the ALJ erred by discrediting her testimony concerning the extent of her impairments. When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no

---

[4] Plaintiff also argues that the ALJ failed to account for her handling and fingering limitations in the RFC, which are premised on her subjective symptom testimony and Dr. Matsushita's treatment records and opinion. Pl.'s Opening Br. 5-7 (doc. 15). Alternatively, plaintiff "acknowledges that the record lacks formal testing to confirm a carpal tunnel diagnosis, largely because of the contributory nature of [her] other impairments [and] treatment limitations secondary to the COVID-19 pandemic," such that the ALJ's duty to further develop the record was triggered. *Id.* at 7-8. Because plaintiff's RFC argument is premised on allegedly wrongfully rejected evidence, it is largely reiterative and contingent upon the other allegations of error and, in any event, the Court finds that remand for further proceedings (in part to develop the record) are warranted as discussed herein.

affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (internal citation omitted). A general assertion the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted). In other words, the "clear and convincing" standard requires an ALJ to "show [their] work." *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022).

Thus, in formulating the RFC, the ALJ is not tasked with "examining an individual's character" or propensity for truthfulness, and instead assesses whether the claimant's subjective symptom statements are consistent with the record as a whole. SSR 16-3p, *available at* 2016 WL 1119029. If the ALJ's finding regarding the claimant's subjective symptom testimony is "supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (internal citation omitted). The question is not whether the ALJ's rationale convinces the court, but whether the ALJ's rationale "is clear enough that it has the power to convince." *Smartt*, 53 F.4th at 499.

At the 2021 hearing, plaintiff testified that she was unable to work due to her myriad physical issues. Following her November 2018 motor vehicle accident, plaintiff started "getting a lot of migraines [and] regular really bad headaches," as well as more pain in her neck and back. Tr. 49-50. Plaintiff stated that the migraines "put me out . . . because I can't do anything" other than "lay there in pain . . . [they are so bad] I can't even get up and take my medication if my

boyfriend isn't there to help me get [it]." Tr. 50-52. She reported getting "migraines maybe a couple times a week" and headaches "contant[ly]." Tr. 50.

Plaintiff also reported back and neck pain "all the time" that is so severe it interferes with her sleep. Tr. 53. Due to her back and neck pain, plaintiff testified that she could only sit or stand for "about 45 minutes to an hour" before needing to change position, and could lift 15 pounds regularly and no more than 40 pounds (i.e., the weight of her daughter) infrequently. Tr. 54-55. Regarding her longstanding hand issues, plaintiff endorsed "trembling" and "a lot of pain" that causes her to "drop things all the time." Tr. 55-56. Her hand symptoms "mak[e] it difficult to do anything." Tr. 56.

In terms of daily activities, plaintiff indicated that her boyfriend works full-time and, while he is working, she is the sole care provider to their 4 year old daughter. Tr. 43-44. She explained that her daughter is very independent and understanding and "knows a lot about what's going on with me," which allows plaintiff "to lay down because my head hurts [and] there's really nothing I can do." Tr. 52. Plaintiff expanded: "I don't do like, kind of what I should do with her because I can't." Tr. 56. As such, plaintiff testified that she spends the first part of the day "just laying around" but, "[t]owards the end of the day," will get up to make dinner. *Id.* Plaintiff testified further that she doesn't drive due to her anxiety, does laundry once per week, picks up after her daughter "here and there," rarely goes grocery shopping because she gets "angry [or is] in pain," and makes dinner three to four times per week but it "takes a long time" and she has appliances that help with the chopping. Tr. 44, 56-57.

After summarizing her hearing testimony, the ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to produce some degree of symptoms, but her "statements concerning the intensity, persistence and limiting effects of these symptoms are

not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Tr. 22. In particular, the ALJ cited to plaintiff's activities of daily living, treatment history, and the objective medical record. Tr. 22-26.

In particular, the ALJ cited to plaintiff's ability to "care for [her] child and participate in near daily exercise" as belying her subjective symptom testimony. Tr. 24, 26. "Even where [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012) (superseded by statute on other grounds). Here, the record reflects that plaintiff repeatedly endorsed exercising six days per week – doing a variety of activities such as "strength training, cardio, pilates, yoga." Tr. 740, 747, 761-63, 933, 1013, 1033, 1035, 1039-40. One provider even noted that plaintiff had lost weight due to "working out consistently." Tr. 741.

The evidence before the Court also shows that plaintiff bathed, played with, fed, and otherwise engaged in regular childcare activities. *See* Tr. 372 (plaintiff stating on her February 2020 "Adult Function Report" that "I care for my daughter and I do all the normal daily care you do for a kid" – i.e., "[p]repare meals, daily hygiene, changes clothes, give bath" and "get [her] ready for bed"); *see also* Tr. 414, 672, 746, 748, 762, 918, 934, 1015. Plaintiff was also unable to attend certain physical therapy and counseling appointments due to her parenting responsibilities and desire to not have others care for her child. *See, e.g.*, Tr. 740, 934, 1036. In addition, the record reflects a wider slate of activities than endorsed at the hearing. *See* Tr. 921 (plaintiff reporting in June 2020 that she spends "around 30 minutes helping her boyfriend get ready for work" on a typical day); *see also* Tr. 373-75, 414-16. Although, as addressed in greater detail in Section II, the ALJ may have erred with respect to plaintiff's treatment history and the medical record, the

ALJ reasonably inferred from the aforementioned activities that plaintiff's functional abilities were greater than alleged.

In sum, because the ALJ cited one legally valid reason, supported by substantial evidence, the ALJ's decision is affirmed as to plaintiff's subjective symptom testimony. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004) (ALJ's evaluation of the claimant's subjective symptom testimony may be upheld even if all the reasons proffered are not valid).

## II.    Medical Opinion Evidence

Plaintiff next asserts the ALJ improperly discredited the opinions of Drs. Matsushita, Abedini, and Gopal. Where, as here, the plaintiff's application is filed on or after March 27, 2017, the ALJ is no longer tasked with "weighing" medical opinions, but rather must determine which are most "persuasive." 20 C.F.R. §§ 404.1520c(a)-(b), 416.920c(a)-(b).  "To that end, there is no longer any inherent extra weight given to the opinions of treating physicians . . . the ALJ considers the 'supportability' and 'consistency' of the opinions, followed by additional sub-factors, in determining how persuasive the opinions are."[5] *Kevin R. H. v. Saul*, 2021 WL 4330860, *4 (D. Or. Sept. 23, 2021). The ALJ must "articulate . . . how persuasive [they] find all of the medical opinions" and "explain how [they] considered the supportability and consistency factors." *Id.* At a minimum, "this appears to necessitate that an ALJ specifically account for the legitimate factors of supportability and consistency in addressing the persuasiveness of a medical opinion." *Id.*

---

[5] As the Ninth Circuit recently explained, "[u]nder the revised regulations . . . a medical source's relationship with the claimant is still relevant when assessing the persuasiveness of the source's opinion." *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022). The new regulations nonetheless "displace our longstanding case law requiring an ALJ to provide" different levels of reasoning (i.e., "clear and convincing" or "specific and legitimate") based on a hierarchy of medical sources. *Id.* at 787.

**A.    Dr. Matsushita**

Plaintiff initiated a primary care relationship with Dr. Matsushita in August 2019 and sought treatment, predominantly for medication management, approximately every three months. Tr. 780-81, 905.

In May 2020, Dr. Matsushita completed two medical opinion forms at the request of plaintiff's attorney. The first, entitled "Treating Physician's Migraine Headache Form," indicated that plaintiff experienced migraines more than once per week and that each headache lasted 20 minutes to two hours. Tr. 831. Dr. Matsushita opined plaintiff's response to her migraine medications was "fair" and that he would not expect these headaches to interfere with plaintiff's ability to work. *Id.*

The second, entitled "Treating Source Statement," outlined plaintiff's diagnoses as: "fibromyalgia, chronic pain with lumbar radiculopathy involving the lower left leg, anxiety and depression, insomnia, and periodic limb disorder." Tr. 905. Dr. Matsushita opined, in relevant part, that plaintiff needed unscheduled 30 minute breaks throughout the day, could sit or stand for 45 minutes at a time and 1 hour total in an eight hour workday, must shift positions at will, could handle and finger objects 20% of an eight hour workday, and would miss more than 4 workdays per month due to her symptoms. Tr. 906-09. The doctor indicated that her opinion was based on plaintiff's imaging studies "showing degenerative changes," a neurosurgery chart note from February 2019 showing a positive straight leg raise and multiple positive Waddells signs, and a negative rheumatology workup. Tr. 906. Although plaintiff's "findings on x-ray and MRI are mild and not indications for surgical management," Dr. Matsushita explained that her other diagnoses in combination can account for her symptoms. *Id.*

The chart note accompanying Dr. Matsushita's medical opinions provided additional information concerning plaintiff's diagnoses, symptoms, and treatment:

> Prior to my interacting with [plaintiff] she had already had the diagnoses of fibromyalgia, chronic back pain with lumbar radiculopathy involving the left lower extremity, anxiety and depression, insomnia and periodic limb movement disorder, polyarthralgia of hands, neck injury secondary to motor vehicle accident, chronic fatigue. I expect these medical conditions to be a chronic challenge . . . that could prevent her from working in the future. What I have described below is a combination of my experience with her as well as documentation from previous providers.
>
> **Chronic low back pain and fibromyalgia –** Her chronic low back pain has been an issue since 2014. She has had imaging including x-ray and MRI that showed discogenic degenerative changes at L4-L5 and L5-S 1 as well as a central to left paracentral disc protrusion at L5-S1. She saw neurosurgery for this but at that time they did not that this would cause radiculopathy to the left lower extremity. However she continues to have sensory changes and weakness in that left lower extremity on exams (see documentation on 12/19/20). She also saw rheumatology who had a negative work-up and diagnosed her with fibromyalgia at that time. She has tried multiple modalities to help with the pain including physical therapy x4, chiropractic care and pain management. She has never been on chronic narcotics and has been successful in implementing exercise therapy into her daily life. Currently on baclofen 10mg as needed and gabapentin 300mg two times a day. To a small extent these have improved her pain however she continues to have daily functional pain that prevents her from being able to engage in any work activities.
>
> **Anxiety and depression –** She was diagnosed with anxiety and depression prior to my knowing her. She has tried various pharmaceutical therapies as well as cognitive behavioral therapy directed at anxiety and depression with our in-house behavioral health specialist without significant improvement. She currently takes sertraline 200mg per day which is the therapeutic maximum. In our many discussions this has severely impacted her life, specifically when it comes to worrying about her daughter.
>
> **Insomnia and periodic leg movement disorder –** She has had difficulties with insomnia for many years was diagnosed by sleep specialist with periodic leg movement disorder as well as obstructive sleep apnea. In some way these have been improved with use of gabapentin however she continues to have chronic fatigue as a result of chronic insomnia. She just recently got an appointment with a cognitive behavioral therapist who specializes on insomnia with hopes that this can improve her outcomes. She currently uses trazodone 50mg at night for sleep.
>
> **Chronic migraines with chronic neck pain –** Her migraines that occur in her occipital, frontal, parietal regions occur 2-3 times per week and last from 20

minutes to 2 hours with symptoms of aura, nausea vomiting, photophobia, phonophobia, throbbing and pulsations. We have tried amitriptyline and propranolol to help with prophylactic treatment however these were not well received. She takes over-the-counter medicines regularly with only a fair response. She states that these have all occurred since her motor vehicle accident in 2018.

**Polyarthralgia of hands** – [She] has come to our clinic multiple times for concerns of hand numbness and tingling and twitching sensation in her hands. This is significantly impacted her ability to do fine motor work for long periods of time. Her rheumatologic work-up was negative . . .

As far as her ability to carry out and remember instructions I feel like she would be fairly able to do this. Although, she has stated to me on multiple occasions that she sometimes cannot remember things that she was just talking about. I believe she would be able to respond appropriately to supervision, coworkers and work pressure in a work setting if it was not for her physical limitations. She is able to hear and speak without challenge.

Tr. 780-82.

The ALJ found that Dr. Matsushita's opinion was "unpersuasive." Tr. 26. The ALJ first denoted that "depression and anxiety are outside of the scope of her expertise as a primary care provider in family medicine." *Id.* Additionally, the ALJ concluded that Dr. Matsushita's functional limitations were "not supported by the benign findings of record" and "not consistent with evidence that documents the effectiveness of the claimant's treatment over the relevant period. For example, the record indicates that the claimant's back impairment is stable on baclofen, her headaches are decreased on sumatriptan and amitriptyline[,] her fibromyalgia is responsive to gabapentin [and her] medications improved her symptoms of hand pain." Tr. 26-27. The ALJ also determined plaintiff's ability to exercise "is not consistent with someone who is unable to use her hands or remain functional due to disabling impairments." Tr. 27. Lastly, the ALJ observed that "most of the claimant's treatment throughout 2020 and 2021 occurred over telemedicine video and phone visits, which precluded the provider from citing objective findings because there were no

physical examinations performed to document the severity of the claimant's impairments resulting in potential overreliance on subjective complaints." *Id.*

Initially, the Court finds that the global pandemic occurring in 2020 and 2021 preventing plaintiff from seeking in-person medical care is not a legally sufficient reason to reject Dr. Matsushita's opinion, especially given that many of plaintiff's underlying conditions pre-existed her treating relationship with Dr. Matsushita and others, such as migraines, are not verifiable through objective measures.

Moreover, as addressed in Section I, while plaintiff did engage in daily exercise, her providers encouraged this as a modality of conservative treatment. *See, e.g.*, Tr. 643, 645, 675, 744; *see also Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) ("[a] patient may do [exercise] activities despite pain for therapeutic reasons, but that does not mean she could concentrate on work despite the pain or could engage in similar activity for a longer period given the pain involved"). The record reflects that this exercise was performed in plaintiff's home, in approximately 30 minutes intervals and guided by online videos. In light of these facts, it was unreasonable for the ALJ to discount Dr. Matsushita's specific functional limitations, especially since they were based on objective measures and an extensive treatment history, and the doctor was aware of plaintiff's daily exercise routine.

Although the ALJ is correct that Dr. Matsushita is not a mental health specialist, she did prescribe plaintiff medications to treat her anxiety and depression, and periodically assessed plaintiff's symptoms using the PHQ-9 and GAD-7 scales, wherein plaintiff typically rated in the moderate to severe range.[6] *See, e.g.*, Tr. 740, 755, 1047. In any event, when Dr. Matsushita's

---

[6] The PHQ-9 and GAD-7 are "two mental health assessment tests . . . which assess depression and anxiety, respectively." *Choat v. Berryhill*, 2018 WL 2048332, *10 (D. Or. Apr. 30, 2018). "A 'high' score is not, as the ALJ implies, indicative of stable, unremarkable mental health symptoms.

opinion is read in conjunction with her contemporaneous chart note, it becomes clear that she was not proffering any functional limitations directly attributable to plaintiff's mental health impairments. Rather, her "Treating Source Statement" merely acknowledges these impairments as a facet of plaintiff's overall medical picture. Indeed, as both the medical record and case law recognize, depression and anxiety commonly co-occur with fibromyalgia. See, e.g., SSR 12-2p, 1996 WL 374187, *3; see also Kaytlin B. v. Comm'r Soc. Sec. Admin., 2020 WL 5803937, *5 (D. Or. Sept. 2020) ("a depression diagnosis would not be eliminated as a source of symptoms because not only are the conditions often co-occurring, but depression is also itself a symptom of fibromyalgia").

Finally, the medical record does not evince exclusively benign findings and the ALJ engaged in impermissible cherry-picking in regard to the effectiveness of plaintiff's medications. See Reddick v. Chater, 157 F.3d 715, 722-23 (9th Cir. 1998) (reversing the ALJ's decision where the ALJ's "paraphrasing of record material" was "not entirely accurate regarding the content and tone of the record"). Specifically, the record contains diagnostic criteria sufficient to establish fibromyalgia and objective imaging of plaintiff's back from August 2018 showing "[d]iscogenic degenerative changes at L4-5 and L5-S1," "[a] central to left paracentral disc protrusion at L5-S1 extending into the left lateral recess and appearing to contact without deviating significantly the left S1 nerve root" with "[m]ild bilateral neural foraminal narrowing . . . at this level," and "[a]nnular bulging with a central posterior annular tear at L4-5 combining to produce mild bilateral

Just the opposite is true and in fact." Id.; see also Salina S. v. Kijakazi, 2022 WL 3700880, *5 n.6 (D. Idaho Aug. 25, 2022) ("PHQ-9 scores are generally interpreted as follows: minimal depression (0-4); mild depression (5-9); moderate depression (10-14); moderately severe depression (15-19); severe depression (20-27)."

neural foraminal narrowing." Tr. 652-63; *see also* Tr. 18 (ALJ finding fibromyalgia and degenerative disc disease to be medically determinable and severe at step two).

Courts within this District have repeatedly acknowledged that even "mild degenerative disc disease can have disabling effects." *Dahl v. Comm'r of Soc. Sec. Admin.*, 2015 WL 5772060, *5 (D. Or. Sept. 30, 2015) (collecting cases); *see also Ellefson v. Colvin*, 2016 WL 3769359, *6 n.5 (D. Or. July 14, 2016) ("mild degenerative changes do not necessarily equate to mild functional limitations"). And, while the record demonstrates that plaintiff's medications have been helpful and there has been some waxing and waning of symptoms, it also shows that plaintiff continued to suffer with widespread body pain and headaches despite regular treatment. *See* Pl.'s Opening Br. 13-19 (doc. 15) (summarizing the medical evidence); *see also Benton v. Comm'r of Soc. Sec. Admin.*, 2022 WL 2071980, *4 (D. Ariz. June 9, 2022) ("[a]s the Ninth Circuit has previously discussed, the presence of waxing and waning of symptoms during the treatment period do not necessarily indicate an ability to maintain employment, nor do some symptoms improving negate a treating provider's opinion"). Therefore, the ALJ erred in evaluating Dr. Matsushita's opinion.

**B.    Dr. Abedini**

In August 2020, Dr. Abedini completed a "Treating Physician's Migraine Headache Form," in which he opined that plaintiff experienced migraines more than once per week and that each headache lasted one to two hours. Tr. 974. The doctor indicated that these migraines were accompanied by aura, photophobia, phonophobia, and throbbing/pulsating. *Id.* At that time, Dr. Abedini noted that plaintiff's response to her migraine medications was "poor," and that he would expect these headaches to: (1) interfere with plaintiff's ability to work; and (2) cause her to miss more than one workday per week. *Id.*

The ALJ found Dr. Abedini's opinion that plaintiff's migraines would interfere with her ability to work more than one day per week "unpersuasive because he does not include any specific clinical findings and he does not provide a detailed opinion of the claimant's functioning." Tr. 27. The ALJ also denoted that "[i]nterference with work does not necessarily equate to disability" and plaintiff was taking amitriptyline by May 2021 "in addition to sumatriptan for pain and headache control." *Id.*

Thus, it appears as though the ALJ overlooked Dr. Abedini's statement that plaintiff's migraines would cause work absenteeism more than one day per week. As a result, the ALJ's determination that Dr. Abedini's opinion essentially does not include any concrete work-related limitations of function is not accurate. Furthermore, the fact that plaintiff was trialed on other prescription migraine and over-the-counter medications, and eventually resumed amitriptyline as her migraines continued does not erode the supportability and consistency of his opinion.

In addition, the chart note accompanying Dr. Abedini's opinion does include specific clinical findings. That is, Dr. Abedini conducted a clinical interview – which reflected plaintiff's statements that her migraines started after her November 2018 automobile accident, occurred randomly and "roughly 3-4 times per week lasting from 30 minutes to 3 hours," and were extremely painful and associated with nausea and light sensitivity – as well as a review of systems and physical examination. Tr. 1015-18. Based on this information, Dr. Abedini recommended "increasing Imitrex to 100 mg at the start of migraine headaches." Tr. 1019.

The record reflects further that, the following month (i.e., in September 2020), plaintiff returned to Dr. Matsushita reporting that she was "still having 3-4 [migraines] a week" despite the increase in her Imitrex. At that time, it was noted that she had tried "propranolol but didn't think it helped with prophylaxis [and] amitriptyline . . . but can't remember what happened with it." Tr.

1028. Accordingly, Dr. Matsushita restarted plaintiff on amitriptyline. Tr. 1031. Subsequent chart notes show that amitriptyline improved her migraines symptoms by "50%" but she still experienced them weekly. *See, e.g.*, Tr. 1038, 1040, 1046, 1055. As such, the ALJ's treatment of Dr. Abedini's opinion is not based on substantial evidence.

### C.    Dr. Gopal

Dr. Gopal was not one of plaintiff's regular treatment providers, although he did share a practice with Dr. Matsushita. Tr. 1090. That is, in May 2021, plaintiff presented to Dr. Gopal "for completion of disability paperwork." *Id.* In completing a form intended for Dr. Matsushita, Dr. Gopal indicated that, "[i]n discussion with [plaintiff] today, she continues to have all the diagnoses [and functional deficits] listed" in Dr. Matsushita's May 2020 "Treating Source Statement." Tr. 1083. As for new conditions, Dr. Gopal cited to plaintiff's headaches and arm weakness. *Id.* Based on these new conditions, Dr. Gopal opined that plaintiff's cognitive functioning was "significant[ly] impaired" but that it was "difficult to say whether her upper extremity limitations have worsened as there have been such limitations on her work for so long." *Id.*

The ALJ rejected Dr. Gopal's opinion because:

> Dr. Gopal did not include an examination of the claimant's back or bilateral upper and lower extremities to render an objective opinion, nor did he identify any basis for identifying a decline in cognitive abilities. Rather, Dr. Gopal appears to have relied on the claimant's subjective physical complaints and determined that she has both functioning and cognitive "debilities" with no specific or detailed evaluation providing a picture of the claimant's level of functioning regarding her ability to perform work. The level of debilitation indicated by Dr. Gopal cannot be reconciled with the claimant's reported day-to-day level of functioning, such as doing yoga 6 days per week, and acting as the sole caregiver to her 4-year old child each day when her boyfriend is at work.

Tr. 27.[7]

---

[7] The ALJ appears to have erroneously attributed Dr. Gopal's opinion to Dr. Matsushita and therefore analyzed it twice. The ALJ nonetheless provided essentially the same reasons both times,

The Court finds that the ALJ's decision as to this issue was based on the proper legal standards and is supported by substantial evidence. An ALJ need not accept a medical opinion that does "not show how [a claimant's] symptoms translate into specific functional deficits which preclude work activity." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601 (9th Cir. 1999). An ALJ may also reject a medical opinion that is inconsistent with the medical record, not supported by clinical findings, or brief and conclusory. *Ford v. Saul*, 950 F.3d 1141, 1154-55 (9th Cir. 2020).

The chart note accompanying Dr. Gopal's May 2021 opinion confirms that he did not independently examine or treat plaintiff – rather, he reviewed her medications, "the document completed by her PCP last year," and her statements concerning her functional limitations. Tr. 1090-91. Further, as discussed in Section I, an independent review of the record reveals that plaintiff was solely responsible for and capable of performing regular childcare activities, which belies Dr. Gopal's statements concerning substantial cognitive difficulties and hand impairment. The ALJ's decision is affirmed in this regard.

## III.    RFC and Remedy

Plaintiff argues that the ALJ's RFC is deficient because it fails to account for the medical opinion evidence and her subjective symptom statements. As addressed herein, plaintiff is correct that the ALJ committed harmful legal error as to Drs. Matsushita and Abedini. *See Nguyen v. Chater*, 100 F.3d 1462, 1466 n.3 (9th Cir .1996) (VE's response to an incomplete hypothetical has "no evidentiary value") (citations and internal quotations omitted).

---

such that any error was harmless. *Compare* Tr. 26, *with* Tr. 27; *see also Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (mistakes that are "nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion" are harmless).

The question thus becomes the proper legal remedy. The decision whether to remand for further proceedings or for the immediate payment of benefits lies within the discretion of the court. *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101-02 (9th Cir. 2014). Nevertheless, a remand for an award of benefits is generally appropriate when: (1) the ALJ failed to provide legally sufficient reasons for rejecting evidence; (2) the record has been fully developed, there are no outstanding issues that must be resolved, and further administrative proceedings would not be useful; and (3) after crediting the relevant evidence, "the record, taken as a whole, leaves not the slightest uncertainty" concerning disability. *Id.* at 1100-01 (citations omitted); *see also Dominguez v. Colvin*, 808 F.3d 403, 407-08 (9th Cir. 2015) (summarizing the standard for determining the proper remedy).

The Court finds that there are ambiguities in the record that warrant further proceedings. On one hand, it is undisputed that plaintiff's physical and mental impairments are longstanding, and have persisted despite regular treatment. On the other hand, plaintiff engaged in regular childcare activities (at least through 2020) and, while the medical record reflets that her back pain and fibromyalgia remained relatively constant or worsened, the severity and extent of her migraines did improve. Further, many of plaintiff's allegedly disabling symptoms did not emerge until well after the alleged onset date. And, due to the pandemic, plaintiff has been unable to obtain a complete work-up surrounding her hand symptoms. Finally, although plaintiff endorsed chronic headaches and anxiety, and cognitive impairments, the Court notes that there was some concern that prescription medication overuse and/or plaintiff's daily utilization of marijuana could be causing or contributing to her symptoms. *See, e.g.*, Tr. 745, 752, 774, 779-80, 836, 1041-42, 1047, 1056.

Accordingly, further proceedings are required to resolve this case. *See Treichler*, 775 F.3d at 1099 (except in "rare circumstances," the proper remedy upon a finding of harmful error is to remand for further administrative proceedings). Given the ambiguity surrounding any potential disability onset date, coupled with the complex and longstanding nature of plaintiff's physical conditions, referral to a consultative examination or the use of a medical expert would be helpful. Therefore, upon remand, the ALJ must seek out a consultative exam or medical expert and, if necessary, reweigh the medical and other evidence of record, reformulate plaintiff's RFC, and obtain additional VE testimony.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is REVERSED, and this case is REMANDED for further proceedings.

IT IS SO ORDERED.

DATED this 1st day of May, 2023.

_____/s/ Jolie A. Russo_____
Jolie A. Russo
United States Magistrate Judge